# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

IN RE ENERGY TRANSFER EQUITY ) Cons. C.A. No. 12197-VCG
L.P. UNITHOLDER LITIGATION )

# MEMORANDUM OPINION

Date Submitted: November 9, 2016
Date Decided: February 28, 2017

Michael Hanrahan, Paul A. Fioravanti, Jr., Samuel L. Closic, Eric J. Juray, of PRICKETT, JONES & ELLIOTT, P.A., Wilmington, Delaware; OF COUNSEL: Lee D. Rudy, Michael C. Wagner, Leah Heifetz, of KESSLER TOPAZ MELTZER & CHECK, LLP, Radnor, Pennsylvania, *Attorneys for Plaintiffs*.

Rolin P. Bissell, Elena C. Norman, Tammy L. Mercer, Benjamin M. Potts, of YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware; OF COUNSEL: Michael C. Holmes, John C. Wander, Andrew E. Jackson, Craig E. Zieminski, of VINSON & ELKINS LLP, Dallas, Texas, *Attorneys for Defendants Energy Transfer Equity, L.P., LE GP, LLC, Kelcy L. Warren, John W. McReynolds, Marshall S. McCrea III, Matthew S. Ramsey, Ted Collins, Jr., K. Rick Turner, Ray Davis and Richard D. Brannon.*

David E. Ross, John A. Eakins, of ROSS ARONSTAM & MORITZ LLP, Wilmington, Delaware; OF COUNSEL: M. Scott Barnard, Michelle Reed, Lauren E. York, of AKIN GUMP STRAUSS HAUER & FELD LLP, Dallas, Texas, *Attorneys for Defendant William P. Williams.*

GLASSCOCK, Vice Chancellor

This unsatisfying Memorandum Opinion addresses cross-motions for partial summary judgment in the context of the issuance of partnership units of a limited partnership, Energy Transfer Equity, L.P. ("ETE" or the "Partnership"). The Memorandum Opinion is unsatisfying because the utility of motions for partial summary judgment lies in clearing away the brush in a litigation, to make traversing the remaining issues straightforward; this decision, however, leaves the thicket largely intact.

The matter involves an issuance of convertible units to some, but not all, unitholders in ETE, in return for which the unitholders gave up their common units (the "Issuance"). The opportunity to participate in the Issuance (the "Offering") was provided to less than all unitholders, and less than all the unitholders to whom the opportunity was extended chose to participate. Ownership of an ETE common unit entails the right to quarterly distributions from the Partnership under certain conditions; holders of convertible units received distributions on a different schedule. The Plaintiffs characterize the difference in distribution schedules as entirely favorable to the convertible unitholders, and the Issuance as a distribution of wealth from ETE to the insiders who received the convertible units. The Defendants, for their part, describe the Offering and Issuance as a tool to defer ETE's obligation to make distributions, enhancing its ability to finance a merger with The Williams Companies, Inc. ("Williams"). They point out that ETE initially

1

considered extending a right to participate in a similar unit exchange to *all* ETE unitholders, but that provisions of the merger agreement with Williams, and Williams' unwillingness to consent, scuttled that idea, resulting—according to the Defendants—in the revised issuance of convertible units that actually occurred. The merger itself foundered; the flotsam that is the Issuance remains.

Rights of limited partners are largely defined by the governing partnership agreement. The most significant issue on these cross-motions involves whether the extension of the right to participate in the Issuance of the convertible units, or the Issuance itself, is a contractual "distribution." If so, the Defendants have breached the partnership agreement, which requires that "distributions" be provided pro-rata to all unitholders. The Plaintiffs argue that the Issuance was a distribution of value to the favored unitholders who were extended the right to participate, and thus amounts to an improper distribution of ETE's assets to some, but not all, unitholders.

The Defendants characterize the Issuance as an exchange for value, in connection with which the Partnership issued units. They point out that an issuance of units, even if conflicted, is permitted under the partnership agreement, so long as its "fair and reasonable" to ETE. They point to ETE's use of a Conflicts Committee approval process as evincing fairness under a safe harbor provision of the partnership agreement. The parties disagree whether the Issuance was a contractual

"distribution" and, if not, whether it is entitled to the contractual safe harbor on which the Defendants rely.

The resulting inquiry presents mixed questions of law and fact. Before characterizing the Issuance as a "distribution"—itself an undefined term in the partnership agreement—I find it appropriate to have a full factual record, and therefore I defer that characterization until after trial. Likewise, although the Plaintiffs have raised significant doubt about the propriety of the process by which the Conflicts Committee undertook its review of the Issuance, whether the Issuance qualifies as contractually "fair and reasonable" involves factual questions appropriately addressed upon a full record. The cross-motions for partial summary judgment are, accordingly, denied. My reasoning is below.

# I. BACKGROUND[1]

The following rather wearying stroll through the facts is necessary to a proper understanding of my resolution of the issues here.[2]

*A. The Parties and Relevant Non-parties*

The lead Plaintiffs, Lee Levine and Chester County Employee's Retirement Fund, have at all relevant times been common unitholders of ETE.[3] The Plaintiffs

---

[1] Unless otherwise noted, the information in this section is undisputed and taken from the verified pleadings, affidavits, and other evidence submitted to the Court.

[2] Anyone who has grown out an avocado seed on a windowsill will recognize how the seed of these facts dwarfs any useful analysis growing therefrom.

[3] Amended and Supplemented Verified Class Action Complaint (the "Complaint" or. "Compl.") ¶ 14.

3

are suing both individually and as a class on behalf of the non-participating common unitholders of ETE for claims arising out of a March 8, 2016 transaction.[4]

Defendant ETE is a master limited partnership ("MLP") organized under Delaware law, with its principal office in Dallas, Texas.[5] ETE is in the business of energy pipelines.[6] ETE is managed by its General Partner, LE GP, LLC ("LE GP") and its board of directors (the "Board").[7] During the time frame relevant to liability the Board consisted of Defendants Kelcy L. Warren, John W. McReynolds, Marshall S. McCrea, Matthew S. Ramsey, K. Rick Turner, Ted Collins, Jr., and William P. Williams (the "Director Defendants").[8] Defendants Ray Davis and Richard D. Brannon (collectively with the Director Defendants, the "Unitholder Defendants") are unitholders of ETE, but neither was a director or officer of ETE during the period relevant to liability.[9]

Defendant LE GP is a Delaware limited liability company and the General Partner of ETE.[10] LE GP is a party to the Limited Partnership Agreement (the "LPA") in its capacity as General Partner.[11]

---

[4] *Id*. at Introduction.
[5] *Id*. at ¶ 15.
[6] *Id.*
[7] *See id.*
[8] *Id*. at ¶¶ 17–23, 26.
[9] *Id*. at Introduction, ¶¶ 24–25.
[10] *Id*. at ¶ 16.
[11] Transmittal Affidavit of Benjamin M. Potts, Esquire ("Potts Aff") Ex. 1 at 1 (Third Amended and Restated LPA, the "LPA").

Non-party Williams is an energy infrastructure company incorporated in Delaware, with its principal offices in Tulsa, Oklahoma.[12] Williams' holdings include pipelines and other energy service related assets.[13] Williams was the counterparty to a merger which was abandoned in June, 2016.

Non-party Energy Transfer Corporation LP ("ETC") is a Delaware limited partnership.[14] ETC was a party to the Williams merger, as discussed below.

Non-party Energy Transfer Partners, L.P. ("ETP") is a Delaware MLP with its principal offices in Dallas, Texas.[15]

*B. The Offering*

    1. <u>The Williams Merger</u>

On September 28, 2015, Williams, ETE, LE GP and select other ETE affiliates executed an Agreement and Plan of Merger (the "Merger Agreement").[16] Pursuant to the Merger Agreement Williams was to merge with and into ETC.[17] The Merger Agreement required a series of transactions (the "Merger"). The intricacies of the deal structure are not necessary to this opinion, as the litigation here involves the Partnership's obligations to its own unitholders in engaging in transactions with select unitholders. Interested readers are referred to this Court's Memorandum

---

[12] Compl. ¶ 27.
[13] *Id.*
[14] *Id*. at ¶ 28.
[15] *Id*. at ¶ 29.
[16] Transmittal Affidavit of Eric J. Juray, Esquire ("Juray Aff.") Ex. 3 (the "Merger Agreement").
[17] *See* Merger Agreement.

5

Opinion in *Williams Companies, Inc. v. Energy Transfer Equity, L.P.*,[18] for further detail regarding the Merger Agreement. It is sufficient for the purposes of this opinion to state that the Merger would have required ETE to pay approximately $6.05 billion in cash, along with ETC common shares, to Williams.[19] ETE expected to incur $6.05 billion in debt to finance the cash component of the Merger, and to assume additional debt from Williams of upwards of $4 billion.[20]

### 2. Commodity Prices Drop

After the Merger Agreement was signed, but before the Merger closed, commodity prices declined.[21] ETE's SEC filings characterized the drop as a recent development, and indicated that the crude oil price decline was "significant" from an average of $60.00 per barrel in June 2015 to an average closing price of $30.62 in February 2016.[22] Natural gas prices suffered a similar decline.[23] Such declines drove down the equity values of energy related companies and the cost of capital for companies in the energy sector increased as investors and financiers became more cautious.[24]

---

[18] 2016 WL 3576682 (Del. Ch. June 24, 2016).
[19] *See* Merger Agreement §§ 2.01(b), 2.04; *Williams Companies*, 2016 WL 3576682, at *1.
[20] Potts Aff. Ex. 3 at 20.
[21] *See, e.g.*, Juray Aff. Ex. 52 at 18.
[22] *Id.*
[23] *See id.*
[24] *See id.* at 18–19.

"As of December 31, 2015, ETE had approximately $7 billion of debt on a stand-alone basis and approximately $36.97 billion of consolidated debt, excluding the debt of its joint ventures."[25]  ETE would incur additional debt of $6.05 billion to finance the cash portion of the Merger, and would also assume $4.2 billion of Williams' debt.[26]

By January 2016, the market prices of ETE units and Williams stock had dropped precipitously from where such securities were trading at the time of the announcement of the Merger.  Similarly, the synergies which ETE and Williams expected from the Merger proved to be significantly over-estimated—rather than the $2 billion per year expected at execution, joint integration planning between the companies reached a number "materially less" of $170 million per year.[27]  The reduction in expected synergies was attributed, in part, to the decline in commodity prices.[28]

The parties dispute whether such decline in the market generally and the attractiveness of the Merger would have forced ETE to reduce or eliminate its cash distributions to holders of common units (the "Common Units").[29]  The Defendants point to record evidence of Kelcy Warren's statements on a February 25, 2016

---

[25] *Id.* at 19–20.
[26] *Id.* at 20.
[27] *Id.* at 19.
[28] *See id.*
[29] *See* Pls' Opening Br. 9; Defs' Opening Br. 9.

7

earnings call that indicated ETE was actively trying to avoid, and did not expect, distribution cuts.[30] The Plaintiffs assert that it was "increasingly probable that ETE would have to reduce or eliminate its cash distributions to holders of Common Units."[31] Such a reduction, the Plaintiffs argue, would impact Kelcy Warren particularly, as they allege such distributions were his primary source of cash flow.[32]

The Defendants assert that ETE was facing credit risks as a result of the deterioration in market conditions, combined with the debt that the Merger required. The Defendants argue that the financing of the cash component of the Merger via the "Bridge Loan" threatened ETE's ability to secure credit in the future at favorable rates.[33] That is, absent efforts to reduce its debt load and debt ratios, ETE faced the threat of a credit downgrade due to the debt arising from the Merger and worsening market conditions.[34] To ETE this was particularly unappetizing as the terms of the Bridge Loan provided that ETE would have to repay or refinance the $6.05 billion credit facility within two years of the Merger.[35] The adverse effects of a credit downgrade were explained in an April 2016 SEC filing.[36] Further, that filing

---

[30] Defs' Opening Br. 9 (quoting Potts Aff. Ex. 8 at PLAINTIFFS-001885).

[31] Pls' Opening Br. 9 (citing, for example, Juray Aff. Ex. 33 at 41, ETE's December 31, 2015 10-K, which indicates that to manage its debt levels the company may need to "reduce the cash distributions we pay to our unitholders").

[32] Pls' Opening Br. 9.

[33] Defs' Opening Br. 7.

[34] *Id.* (citing Potts Aff. Ex. 3).

[35] Potts Aff. Ex. 3 at 9, 40–41.

[36] *See* Potts Aff. Ex. 3.

disclosed that if certain outstanding notes of a Williams entity—which would become an ETE subsidiary post-closing—were downgraded, an obligation to repurchase the notes costing upwards of $2.9 billion could be triggered.[37] It is in this context that the unit offering at issue here was conceived.

### 3. The Offering

The transaction underlying this litigation was initially planned as a public offering; however, ETE was not able to secure certain required approvals from Williams to facilitate the planned transaction. ETE's stated motivation for the Issuance was to finance the Merger while alleviating "the mounting pressure from the ratings agencies."[38] The Plaintiffs assert this debt rationale was "bogus."[39]

#### a. The Public Plan

The initial plan was to issue $1 billion in Convertible Preferred Units ("Convertible Units") as a part of a public offering to all unitholders.[40] Pursuant to the initial plan, ETE public unitholders were to be offered the opportunity to participate in the "Plan," through which they would make a one-time election to forgo their quarterly distributions for eight quarters taking instead a preferred distribution capped at $0.11 a unit, and agreeing not to transfer the units during the

---

[37] *Id.* at 63.
[38] Defs' Opening Br. 10.
[39] *See* Pls' Answering Br. 4.
[40] *See* Potts Aff. Ex. 9 at ETEe-LEVINE-00000019–20.

Plan period.[41] Participating unitholders would receive one Convertible Unit for each Common Unit that the holder elected to surrender. At the time of the proposed public plan, ETE Common Units had most recently paid distributions of $0.285 per quarter,[42] and did not contain a restriction of transferability.[43] At the end of the Plan period, the Convertible Units would convert into additional Common Units based on a specified "Conversion Value" calculation.[44] Part of the Conversion Value formula provided that electing unitholders would accrue value of $0.285 a unit per quarter, redeemable, ultimately, as Common Units.[45] By decreasing distributions to current unitholders ETE sought to free up cash flow to manage the Bridge Loan and other debt obligations.[46] It appears this issuance was set at $1 billion because the Merger Agreement provided a $1 billion cap on equity issuances by ETE.[47]

By early February 2016, the Public Plan was presented to the boards of LE GP and ETP.[48] Williams' consent was required in order for the public offering to move forward, but Williams withheld its consent.[49] Specifically, ETE needed to

---

[41] *Id.*

[42] *Id.*

[43] Juray Aff. Ex. 55 at 40:1–42:2 (Welch) (explaining concerns he raised as the former CFO of ETE about the restriction on transferability's effect on institutional investors ability to participate).

[44] Potts Aff. Ex. 9 at ETEe-LEVINE-00000019–20.

[45] *Id.* at ETEe-LEVINE-00000020.

[46] *See* Defs' Opening Br. 11.

[47] *See id.* at 12 (quoting Potts Aff. Ex. 10 §4.01(b)(v)(1) ("[ETE] may make issuances of equity securities with a value of up to $1.0 billion in the aggregate.")).

[48] *See* Juray Aff. Exs. 12, 13.

[49] Compl. ¶ 67.

10

register the securities planned to be issued via the Public Plan with the SEC, however Williams refused to consent and provide certain information needed to facilitate the requisite SEC filings.[50] Williams recognized that the "planned action [was] intended to strengthen the credit profile of ETE,"[51] nonetheless, on February 18, 2016, Williams informed ETE of its decision to withhold the necessary consents.[52]

### b. The Private Plan

On February 22, 2016, following Williams' refusal to consent to a public offering, LE GP held a board meeting where Kelcy Warren presented a proposal from "management . . . to conduct a private placement of the Convertible Units . . . subject to conflicts committee approval."[53] Such a placement, theoretically, avoided SEC filings, and thus did not require Williams' cooperation. By the next day, the draft SEC filing required for the proposed public offering was revised into a draft of the Private Placement Memorandum (the "PPM").[54] Similarly, the draft of an amendment to the LPA ("Amendment 5") was revised to reflect that "certain" accredited investors, rather than "all" common unitholders were to be given the right

---

[50] Potts Aff. Ex. 12.
[51] *Id.*
[52] *Id.*
[53] Juray Aff. Ex. 18.
[54] Juray Aff. Ex. 19.

to participate in the Private Plan.[55]  The substantive terms of the Private Plan do not appear to have materially changed from the terms of the thwarted Public Plan.[56]

### 4. The Conflicts Committee

The LE GP Board voted at the February 22, 2016 meeting to establish a conflicts committee to determine whether to approve the proposed private issuance.[57]  At the same meeting the Board unanimously approved establishing a conflicts committee (the "Conflicts Committee") consisting of Ted Collins, Richard Turner, and William P. Williams.[58]  The LPA provides that "'Conflicts Committee' means a committee of the Board of Directors of the General Partner composed entirely of one or more directors" who meet certain qualifications.[59]  Among other qualifications, a director is not permitted to serve on the Conflicts Committee if they are "officers, directors or employees of any Affiliate of the General Partner."[60]  Neither Turner nor Collins could comply with this provision.  Turner was a director of Sunoco LP, which was an affiliate.[61]  Collins was a director of ETP which was also an affiliate.[62]  A February 28, 2016 resolution of the LE GP Board indicates that

---

[55] Juray Aff. Ex. 21 at ETEe-LEVINE-00031239.
[56] *Compare* Potts Aff. Ex. 9 at ETEe-LEVINE-00000019–20 *with* Potts Aff. Ex. 14 at ETEe-WMB-00047553–54.
[57] *See* Juray Aff. Ex. 18 ("Mr. Warren then explained that ETE would need to establish a conflicts committee to determine the fairness of the private placement transaction.").
[58] *Id.*
[59] LPA § 1.1.
[60] *Id.*
[61] *See* Potts Aff. Ex. 16 at 114, 116–17.
[62] *Id.* at 114, 117.

the Conflicts Committee consisted of *only* William P. Williams.[63] The record, however, is devoid of any resolution or resignation that demonstrates that Collins and Turner had been *removed* from the Conflicts Committee by this time.

It is not entirely clear, at this stage, the events that occurred between February 22, and February 28, 2016 concerning the composition of the Conflicts Committee. The parties dispute the propriety of the Conflicts Committee process and whether Special Approval, as defined by the LPA, was received. The following summary of events is non-exhaustive and is simply meant to orient the reader to the general timeline of events; it does not constitute my findings as to the actions of the Conflicts Committee or the validity of the Special Approval sought, issues resolution of which awaits a developed record.[64]

On February 26, 2016, Kelcy Warren sought to schedule a Board meeting of ETE for February 28, 2016 to have the work of the Conflicts Committee approved by the Board.[65] At this point, however, the Conflicts Committee had yet to hold a meeting. As of 10:21 a.m. on February 26, 2016, ETE insider John McReynolds still characterized Collins as the "Chair" of the Conflicts Committee.[66]

---

[63] Potts Aff. Ex. 17 at ETEe-LEVINE-00000388–89.

[64] I note the Plaintiffs have challenged the timing and propriety of certain Board minutes. It appears certain minutes were drafted on April 7, 2016. *See* Juray Aff. Ex. 67.

[65] Juray Aff. Ex. 22.

[66] *Id.* ("[T]he Conflicts Committee, which is being chaired this time by Ted Collins, will be in a position to report to the Board as to their findings . . . .").

The Conflicts Committee met for the first time by phone at 5:30 p.m. on February 26, 2016, for a twenty-minute meeting.[67] The minutes indicate that "the sole member of the Committee," William P. Williams, was in attendance.[68] The stated purpose of the meeting was to discuss the engagement of Akin Gump Strauss Hauer & Feld LLP ("Akin Gump") as legal counsel for the Committee, and discuss the engagement of a financial advisor.[69] The Committee engaged Akin Gump as its legal advisor after disclosures of potential conflicts.[70] Further, the Committee directed Akin Gump to set up a meeting with FTI Consulting, Inc. ("FTI"), a potential financial advisor for the following day to discuss the proposed transaction.[71] The minutes indicate that the attorney participating from Akin Gump advised Mr. Williams that "the Committee and the Audit and Conflicts Committee of the General Partner could participate in discussions together" but that Mr. Williams would still "need to independently deliberate and reach his own conclusions."[72] Also on February 26, 2016, Ted Collins signed an engagement letter with FTI on behalf of the "Conflicts Committee of the Board of Directors of Energy

---

[67] Juray Aff. Ex. 23.
[68] *Id.* at ETEe-LEVINE-00000394.
[69] *Id.*
[70] *Id.* at ETEe-LEVINE-00000395.
[71] *Id.* at ETEe-LEVINE-00000396.
[72] *Id.* at ETEe-LEVINE-00000395.

Transfer Equity, L.P." for FTI to provide advisory services related to the "private placement offering of convertible preferred units."[73]

From February 27 to February 28, 2016, the Conflicts Committee held three additional meetings.[74] The three meetings of the Conflicts Committee were held as joint meetings of the Conflicts Committee and the Audit and Conflicts Committee (the "Audit Committee") of the Board of Directors of LE GP.[75] The minutes indicate each of these meetings was attended by Mr. Williams as the "sole member" of the Conflicts Committee, tasked with reviewing the transaction pursuant to the terms of the LPA.[76] Additionally, the minutes indicate each of these three meetings was attended by Mr. Collins who, along with Mr. Williams, constituted the Audit Committee of the Board of Directors of LE GP, which was required to review the proposed transaction pursuant to LE GP's LLC Agreement.[77] FTI presented financial information regarding the effect the Convertible Units would have on ETE's debt load and leverage ratios.[78] The projections indicated that ETE would be able to lower its leverage ratio closer to what ratings agencies expect in order to provide a "a neutral rating."[79]

---

[73] Juray Aff. Ex. 66.
[74] Juray Aff. Exs. 24–26.
[75] *See id.*
[76] *Id.*
[77] *Id.*
[78] *See, e.g.*, Potts Aff. Ex. 17 at ETEe-LEVINE-00000371–85.
[79] *Id.* at ETEe-LEVINE-00000385.

Minutes of a February 28, 2016 joint meeting of the Audit Committee and the Conflicts Committee provide that Mr. Williams and Mr. Collins approved the Convertible Units transaction, the Plan and Amendment 5 on behalf of the Audit Committee.[80] Mr. Collins then left the meeting and Mr. Williams, acting as the sole member of the Conflicts Committee, approved the transaction and voted to grant "Special Approval."[81] The Conflicts Committee resolved that the transaction and related agreements were "in the best interest of [ETE]."[82] Later that day the full Board of LE GP, acting on the Conflicts Committee's determination, approved the Convertible Unit transaction, the Plan, and Amendment 5.[83]

The Plaintiffs argue strenuously that the Special Approval process by the Conflicts Committee failed to comply with the contractual requirements of the LPA. They point to the lack of contemporaneous documentation demonstrating that the two ineligible members had been removed.[84] Further, the Plaintiffs point to allegedly inconsistent language used in the February 28, 2016 LE GP board minutes, including the characterization that a "special committee" of Collins, Turner, and Williams was formed.[85] Similarly, the Plaintiffs point to the apparent discrepancy between the original February 22, 2016 minutes appointing three people to the

---

[80] Juray Aff. Ex. 26 at 5.
[81] *Id.*; Potts Aff. Ex. 23.
[82] Potts Aff. Ex. 23.
[83] Juray Aff. Ex. 29; Potts Aff. Ex. 24.
[84] *See* Pls' Opening Br. 20–21.
[85] *See* Juray Aff. Ex. 29; Pls' Opening Br. 20–21.

Conflicts Committee and later Conflicts Committee minutes stating the Committee consisted of just Mr. Williams.[86] Thus, Plaintiffs' position is that one of three members, less than the required majority, gave Special Approval—therefore no valid Special Approval was given.[87]

### 5. The Convertible Unit Transactions

The February 28, 2016 resolution of the LE GP Board indicates that the Partnership would "offer to certain of its common unitholders who are 'accredited investors' . . . the opportunity to participate in the plan."[88] The Partnership was to provide Plan offerees with a PPM and an election form.[89] While the Offering was limited to accredited investors as defined by SEC regulations, not all accredited investors holding ETE units were invited to participate in the Plan.[90] The invitation to participate was rather limited.[91]

---

[86] Pls' Opening Br. 20–21.

[87] *Id.* at 22.

[88] Juray Aff. Ex. 27 at ETEe_LEVINE-000003888.

[89] *Id.*

[90] *See* Potts. Aff. Exs. 26, 27. It appears about twenty-five people or entities participated in the Issuance. The Defendants argue that not all people invited to participate actually participated. Defs' Opening Br. 16.

[91] *See* Potts Aff. Exs. 26, 27 (listing potential participants and actual participants); Juray Aff. Ex. 42 at ETEe-LEVINE-00003490 (indicating the Plan was "offered to certain long-term unitholders including management and Kelcy Warren, as well as several large institutional investors who are long-term holders with meaningful ownership positions and who we believed could act quickly and be capable of agreeing to the nine quarter transfer restrictions").

### a. The Private Placement Memorandum

On February 29, 2016, ETE sent the PPM to those selected to receive the opportunity to participate in the Plan.[92] The PPM provided that unitholders had the opportunity to "make a one-time election" to exchange one Convertible Unit for each Common Unit they held.[93] Each recipient of the Offering had until the close of business on March 3, 2016 to return their election decision and a questionnaire evincing their status as an accredited investor.[94] However, the deadline was extended to March 4, 2016 to allow certain "potential offerees the ability to participate."[95] I note that the PPM provided that "[p]rior to the Closing Date, we may modify or terminate this offering or the Plan . . . at any time . . . ," and thus no enforceable rights accrued based on the PPM.[96] The record reflects that some common unitholders requested to participate, but were not permitted.[97] The Plaintiffs argue that this dissemination of the PPM was a "Rights Distribution."[98]

---

[92] *See* Juray Aff. Ex. 32.

[93] *Id.* at ETEe-WMB-00047553.

[94] *Id.*

[95] Juray Aff. Ex. 37.

[96] Juray Aff. Ex. 32 at ETEe-WMB-00047570.

[97] *See, e.g.*, Juray Aff. Exs. 51 at 2; 57 at 76–77.

[98] *See, e.g.*, Pls' Opening Br. 49–50 (arguing "[t]he rights were distributed to limited partners in their capacity as limited partners through dissemination of the February 29, 2016 Private Placement Memorandum and were exercisable from February 29, 2016 through March 4, 2016").

b. The Convertible Units

On March 8, 2016, ETE issued 329,399,267 Convertible Units to the electing unitholders.[99] This represented participation of approximately 31.5% of ETE's total Common Units.[100] Of the Convertible Units issued, the majority, 187,313,942, went to ETE's Chairman, Kelcy Warren.[101] Other Defendants acquired a substantial number of units, and together the Unitholder Defendants own approximately 85% of the Convertible Units issued.[102] Record evidence indicates that as of March 11, 2016, Fitch Ratings considered ETE's Convertible Units "a proactive step in enhancing its liquidity and managing acquisition leverage in a credit neutral manner" but that the "issuance ha[d] no immediate impact to ETE's rating."[103]

c. Amendment 5

Amendment 5 was also entered on March 8, 2016,[104] by LE GP as the General Partner of the Partnership "on behalf of itself and the Limited Partners of the Partnership."[105] Amendment 5 established the "designations, preferences and relative participating, optional or other special rights, powers and duties of holders of the Convertible Units."[106] That is, Amendment 5 amended the LPA to

---

[99] Potts Aff. Ex. 25 at 2.
[100] *Id.*
[101] *Id.*
[102] *See* Juray Aff. Ex. 82 at 15.
[103] Potts Aff. Ex. 28.
[104] Juray Aff. Ex. 41; Potts Aff. Ex. 25 at 3.
[105] Juray Aff. Ex. 41 at 1.
[106] Potts Aff. Ex. 25 at 3.

accommodate the new units.[107]  This amendment was done via Section 13.1 of the LPA, which provides that the General Partner may amend the LPA in certain circumstances, including amendments "necessary or appropriate" to the issuance of securities "without the approval of any Partner."[108]

Section 1(a) of Amendment 5 added numerous definitions to the LPA related to the new Convertible Units.[109]  Section 1(c) of Amendment 5 set out the terms of the Convertible Units by adding Section 5.15 to the LPA.[110]  Further, Section 1(f) of Amendment 5 restated Section 6.3 of the LPA.  Section 1(f) deleted the phrase "in accordance with their respective Partnership Interests" from Section 6.3(a) of the LPA which governs the terms for quarterly cash distributions to partners.[111]  This appears to be an attempt to accommodate the functioning of the Convertible Units. Amendment 5 left Section 6.3(a) of the LPA otherwise unchanged.[112]  Additionally, Section 1(f) of Amendment 5 added new Sections 6.3(e), 6.3(f) and 6.3(g) to the LPA.[113]  New Sections 6.3(e) and 6.3(f) relate to the Convertible Units' distribution

---

[107] *See* Defs' Opening Br. 2 (indicating the Amendment "effectuated the Issuance by adding the new securities to ETE's equity structure").

[108] LPA § 13.1(g). *See* Juray Aff. Ex. 41 at 1 (citing Sections 5.8, 13.1(g) and 13.1(d)(i) as the basis of authority for the Amendment).

[109] Juray Aff. Ex. 41 § 1(a).  The Plaintiffs indicate that "[m]any of these additional definitions relate to the newly created Convertible Units."  Pls' Opening Br. 26.

[110] Juray Aff. Ex. 41 § 1(c).

[111] *Compare* LPA § 6.3(a) *with* Juray Aff. Ex. 41 § 1(f).

[112] *Id.*

[113] Juray Aff. Ex. 41 § 1(f).

20

preference.[114]   New Section 6.3(g) provides that, notwithstanding the other limitations and provisions on distributions, an "Extraordinary Distribution shall be distributed" to Common and Convertible Units "in accordance with their respective Percentage Interests, and on an As-Converted Basis."[115]

### 6. ETE Terminated the Merger but the Units Remain

In early April 2016 ETE recognized that the transaction with Williams' would be even more unpalatable than previously expected.[116]   By April 18, 2016, ETE notified the public that if the Merger with Williams closed, that is, if ETE continued on the present path, there would be no distributions to common unitholders from the second quarter of 2016 through the fourth quarter of 2017.[117]

The Merger failed to close following an opinion of this Court on June 24, 2016, and ETE's subsequent notice of termination on June 29, 2016.[118]   The Convertible Units remain even after ETE's termination of the Merger, and their validity and the propriety of their creation form the basis of the present litigation. Since the termination of the Merger, ETE is no longer projecting distribution cuts, and the second quarter of 2016 distribution for ETE Common Units remained at

---

[114] *See id.*
[115] *Id.*
[116] *See* Juray Aff. Ex. 57 at 70; Potts Aff. Exs. 31, 32.
[117] *See* Potts Aff. Ex. 3 at 24–25.
[118] *See* Juray Aff. Ex. 59 at 1 (indicating ETE "terminated" the Merger on June 29, 2016).

21

$0.285.[119]  The provisions of the LPA and other texts necessary to the Court's analysis are described below in the relevant analysis section.

*C. Procedural History*

Plaintiff Lee Levine initiated this action on April 12, 2016, and the matter was expedited shortly thereafter.  This action was consolidated with a similar action on May 3, 2016.

Following discovery, an Amended and Supplemented Verified Class Action Complaint (the "Complaint") was filed on August 29, 2016.  The Compliant pleads four counts.  Count I alleges a breach of Section 6.3 of the LPA against ETE, LE GP and the Unitholder Defendants.[120]  Count I asserts that the "Rights Distribution" and the "Convertible Units Distribution" were an extraordinary non-cash distribution made in violation of Section 6.3's requirements that such a distribution be made in accordance with unitholders' respective percentage interests.[121]  Count II alleges a breach of Section 7.6(f) of the LPA against ETE, LE GP, and the Unitholder Defendants.[122]  Count II asserts that ETE, LE GP, and the Unitholder Defendants breached 7.6(f)'s requirement that conflicted transactions be "fair and reasonable to the Partnership" because none of the enumerated safe harbors were met and the terms

---

[119] Potts Aff. Ex. 33.
[120] Compl. ¶¶ 162–169.
[121] *See id.*
[122] *Id.* at ¶¶ 170–177.

of the Issuance of Convertible Units were not fair and reasonable.[123] Count III asserts a claim for breach of the contractual "good faith" obligations in making determinations and approvals under Sections 5.8, 7.9(a), 7.9(b), 13.1(d)(i) and 13.1(g) of the LPA against ETE, LE GP and the Director Defendants.[124] The Plaintiffs assert nine different theories for this Count.[125] Count IV asserts that Amendment 5 was not permitted by Section 7.9(a) of the LPA and thus ETE, LE GP and the Unitholder Defendants breached the LPA.[126] The theory of Count IV is that the Amendment was a conflict situation and that by not securing any of the exceptions under Section 7.9, "the Amendment is not permitted and the entry into and implementation of the Amendment were in breach of the Partnership Agreement."[127]

The Defendants and the Plaintiffs have both moved for partial summary judgment. Each partial summary judgment request is described briefly below.

The Plaintiffs seek summary judgment on two primary points. First, the Plaintiffs seek summary judgment that the "Rights Distribution and Convertible Units Distribution are invalid because they were non-Pro Rata distributions of securities to some limited partners in their capacity as Partners that were not in

---

[123] *See id.*
[124] *Id.* at ¶¶ 178–195.
[125] *Id.* at ¶¶ 187–195.
[126] *Id.* at ¶¶ 196–202.
[127] *See id.* at ¶¶ 199–202.

accordance with their percentage interests in the Partnership."[128] The Plaintiffs argue such "distributions" were not authorized and violated the LPA. Second, the Plaintiffs seek summary judgment that the "Defendants breached the Partnership Agreement because, in its haste, the LE GP Board of Directors . . . failed to establish a duly constituted Conflicts Committee composed of directors who were not also directors of an affiliate of the General Partner."[129] The Plaintiffs argue that the flaws in this process result in a failure to establish Special Approval as defined by the LPA, and that they are entitled to summary judgment that Special Approval was not given.

The Defendants seek partial summary judgment on a number of points. First, the Defendants argue that the "Plaintiffs' claims against the Individual Defendants and ETE fail as a matter of law because Plaintiffs' breach-of-the-LPA claims can only be brought against the General Partner."[130] Second, the Defendants assert that "Count III fails as a matter of law to the extent it relates to a breach by the General Partner for approving the Amendment because Section 13.1(g) forecloses any such claim."[131] Third, the Defendants argue that "Count IV fails as a matter of law because Section 7.9(a) does not provide a claim for breach as to the Amendment."[132] The Defendants argue Section 7.9(a) "is an optional safe harbor provision that

---

[128] Pls' Opening Br. 2.
[129] *Id.* at 3.
[130] Defs' Opening Br. 32.
[131] *Id.*
[132] *Id.*

cannot be breached as a matter of law."[133]  Finally, the Defendants assert that "Count I fails as a matter of law because the Issuance is an issuance of equity securities, not a distribution subject to Section 6.3 of the LPA."[134]  The Defendants' final summary judgment request, regarding Section 6.3, overlaps directly with Plaintiffs' first summary judgment request.  It appears the Defendants are *not* seeking summary judgment regarding Count II as pled against the General Partner, and Count III regarding the claims under Sections 5.8 and 7.9 as pled against the General Partner.[135]

Oral Argument was held in this matter on November 9, 2016.  This Memorandum Opinion addresses the parties' Motions for Partial Summary Judgment.

## II. STANDARD OF REVIEW

The parties have cross-moved for partial summary judgment pursuant to Court of Chancery Rule 56.  The standard is well settled that "[w]hen opposing parties make cross motions for summary judgment, neither party's motion will be granted unless no genuine issue of material fact exists and one of the parties is entitled to judgment as a matter of law."[136]  That is, each party must show in support of its own

---

[133] *Id*. at 25.
[134] *Id*. at 32.
[135] *See id.* at 4–5.
[136] *Shuba v. United Servs. Auto. Ass'n*, 77 A.3d 945, 947 (Del. 2013).

motion that there is no genuine issue as to any material fact, and that it is entitled to judgment as a matter of law. The facts are viewed in the light most favorable to the nonmoving party on each motion.

There is no "right" to summary judgment and "the court may, in its discretion, deny summary judgment if it decides upon a preliminary examination of the facts presented that it is desirable to inquire into and develop the facts more thoroughly at trial in order to clarify the law or its application."[137] When reviewing a Rule 56 motion I am not to weigh evidence, rather I am to "determine whether or not there is any evidence supporting a favorable conclusion to the nonmoving party."[138] Any request for summary judgment "must be denied if there is any reasonable hypothesis by which the opposing party may recover, or if there is a dispute as to a material fact or the inferences to be drawn therefrom."[139]

## III. ANALYSIS

The partial summary judgment motions here each require interpretation of the LPA, in light of the facts involved with the Issuance. The LPA is a contract that supplies the obligations the Plaintiffs seek to enforce. In construing the LPA, I am guided by our case law concerning such agreements. However, each specific

---

[137] *In re El Paso Pipeline Partners, L.P. Derivative Litig.*, 2014 WL 2768782, at *9 (Del. Ch. June 12, 2014) (citations omitted).

[138] *Id.* at *8 (quoting *Cont'l Oil Co. v. Pauley Petroleum, Inc.*, 251 A.2d 824, 826 (Del. 1969)).

[139] *Id.* (quoting *Vanaman v. Milford Mem'l Hosp., Inc.*, 272 A.2d 718, 720 (Del. 1970)).

26

agreement must be interpreted in accordance with its own terms, thus a review of prior cases in our Courts tends not to be helpful.[140] Nonetheless, a review of the teachings in prior cases of first principles in limited partnership agreement interpretation provides guidance on the issues present here.

Our Supreme Court recognizes that "[l]imited partnership agreements are a type of contract," and are to be construed "in accordance with their terms to give effect to the parties' intent."[141] Similarly, "[t]he Delaware Revised Uniform Limited Partnership Act (DRULPA) gives 'maximum effect to the principle of freedom of contract and to the enforceability of partnership agreements.'"[142] Basic contract principles are applicable including that words are to be given their "plain meaning unless it appears that the parties intended a special meaning" and that the agreement is to be construed as a whole giving "effect to every provision if it is reasonably possible."[143] Further, "[a] meaning inferred from a particular provision cannot control the agreement if that inference conflicts with the agreement's overall scheme."[144] Finally, when interpreting the contractual language of a limited partnership agreement, if, but only if, the contractual terms are ambiguous and the

---

[140] *See Allen v. Encore Energy Partners, L.P.*, 72 A.3d 93, 100 (Del. 2013) (noting that while a series of master limited partnerships cases have come before the Supreme Court, the "precise language" of each agreement needs to be analyzed because "facial similarities can conceal significant differences between the limited partnership agreements").

[141] *Norton v. K-Sea Transp. Partners L.P.*, 67 A.3d 354, 360 (Del. 2013) (citation omitted).

[142] *Id.* (quoting 6 *Del. C.* § 17–1101(c)).

[143] *Id.* (citations omitted).

[144] *Id.* (citations omitted).

27

limited partners did not negotiate for such terms, I may invoke the principle of *contra proferentem* and construe the ambiguous terms against the drafter.[145]  The rule of *contra proferentem* is of particular importance to the just adjudication of limited partnership agreements, since often the unitholders had no hand in the negotiation or drafting of the agreement from which their rights derive.

With these principles in mind, I turn to the task of evaluating this particular agreement.  Neither the Defendants' nor the Plaintiffs' motions are potentially dispositive of this matter—regardless of my findings in this opinion issues will remain for trial.  I note the primary dispute on these motions is twofold.  First, whether the Issuance (and the corresponding Conflicts Committee process) failed the contractual safe harbor of Special Approval provided by the LPA; and second, whether the Issuance (and the precedent Offering via receipt of the PPM) constituted a contractual "distribution."  With respect to the latter, if the Offering and the Issuance were "distributions," they violate the LPA, which requires distributions to be pro-rata.  In light of the factual questions that remain, I find that both questions are better answered on a post-trial factual record.

---

[145] *See id.* ("If the contractual language at issue is ambiguous and if the limited partners did not negotiate for the agreement's terms, we apply the *contra proferentem* principle and construe the ambiguous terms against the drafter.") (citation omitted); *In re Kinder Morgan, Inc. Corp. Reorganization Litig.*, 2014 WL 5667334, at *3 (Del. Ch. Nov. 5, 2014) ("Where a limited partnership agreement was drafted exclusively by the general partner, the court will interpret ambiguities against the drafter, rather than examine extrinsic evidence.") (citations omitted).

*A. Partial Summary Judgment Requests*

    1. <u>Special Approval</u>

In conducting the Issuance, the Defendants rely on the general and broad authority to issue securities provided by Section 5.8 of the LPA. Section 5.8(a) states that:

> [t]he Partnership may issue additional Partnership Securities and options, rights, warrants and appreciation rights relating to the Partnership Securities for any Partnership purpose at any time and from time to time to such Persons for such consideration and on such terms and conditions as the General Partner shall determine, all without the approval of any Limited Partners.[146]

The authority to issue securities is not unlimited. Rather, it is subject to review under the appropriate contractual standard. The LPA provides an over-arching "good faith" requirement whereby the Board, or the party acting, must "believe that the determination or other action is in the best interests of the Partnership."[147] Issuances that arise out of conflicts situations, however, are subject to a higher level of scrutiny.[148]

The Parties agree that certain aspects of the Issuance and the enabling amendments to the LPA were conflicted transactions. Conflicted transactions are subject to review under Section 7.9(a) of the LPA.[149] Section 7.9(a) provides four

---

[146] LPA § 5.8(a).
[147] *See id.* §§ 7.6(f), 7.9(b).
[148] *Id.* § 7.9(a).
[149] *See id.* § 7.9(a).

29

ways for the General Partner or its affiliates to resolve the conflict: (1) by Special Approval, (2) by majority approval of Common Unitholders, (3) by ensuring the terms are "no less favorable to the Partnership than those generally being provided to or available from unrelated third parties," or (4) by providing terms that are "fair and reasonable to the Partnership, taking into account the totality of the relationships between the parties involved. . . . "[150] Section 7.6(f) addresses transfers of property between the General Partner or its affiliates, and ETE, and provides a similar list of safe harbors, including Special Approval.[151]

The Plaintiffs seek partial summary judgment that the Defendants did not comply with the Special Approval procedure set out in the LPA and thus this Court should enter judgment declaring that Special Approval was not received. The Defendants seek a declaration that Special Approval was an optional safe harbor, and failure to receive it, alone, is not an independent breach, an issue that I do not address further.[152] Under the LPA, Special Approval "means approval by the sole member or by a majority of the members of the Conflicts Committee, as

---

[150] LPA § 7.9(a).
[151] LPA § 7.6(f).
[152] *See* Defs' Opening Br. 25–27. Under the terms of the LPA, Special Approval was an optional safe-harbor to meet contractual duties in a conflicts situation—failure to receive Special Approval is not, of itself, a breach. *See* LPA §§ 7.6(f), 7.9(a) (indicating that Special Approval is one of several ways to meet the contractual standard); *See also El Paso Pipeline GP Co., L.L.C. v. Brinckerhoff*, 2016 WL 7380418, at *8 n.41 (Del. Dec. 20, 2016) (collecting cases which have read similar provisions as optional safe-harbors). It is not clear to me that the Plaintiffs contend otherwise, and I therefore need not address the matter further.

30

applicable."[153]  Thus, the LPA permits a single-member Conflicts Committee, but requires that any Conflicts Committee approve conflicted transactions by majority vote.

There are a number of uncertainties concerning the Special Approval process at issue here, but it is sufficient to the denial of Plaintiffs' motion to address only one: did the Conflicts Committee consist of one member or three at the time it rendered its finding, and was that finding by a majority of the members of the Committee?  The events that transpired between February 22, and February 28, 2016, are less than clear in the present record.  The record indicates that the directors initially created a three-person Conflicts Committee.  Importantly from the point of view of protection of the unitholders, the LPA provides that all members of the Conflicts Committee, among other qualifications, shall be unaffiliated with the General Partner.[154]  However, two members, Collins and Turner, were affiliates of the General Partner and thus not eligible to serve.  In other words, the Committee initially established by the Director Defendants was not composed of contractually qualified members.

The Committee thereafter is referred to in the record—consistently, but not exclusively—as a one-man Committee, consisting solely of Mr. Williams.  I assume

---

[153] LPA § 1.1.

[154] *See id.*

31

Mr. Williams to be unaffiliated, and that, to the extent the Directors appointed a Committee consisting solely of Mr. Williams who thereafter rendered a contractually-sufficient approval, the Defendants would have arrived thereby at a safe harbor with respect to the Issuance. Reaching safe harbors, metaphorical or actual, typically requires staying within the channel as marked. There remains a gap in the record, warranting further development, to determine whether the strictures of the Special Approval process were met here. That is, who was actually on the Committee, when, and was majority approval received? The Plaintiffs have raised serious questions about the constitution and actions of the Conflicts Committee, and I have doubts whether the Defendants will be able to rely on the Special Approval process here; nonetheless, this issue will benefit from further factual development, and the Plaintiffs' motion on this issue is denied.[155]

### 2. Distribution vs. Issuance

Regardless of whether the Defendants have complied with the safe harbor provisions of the LPA in connection with the Issuance viewed as a contractually conflicted issuance of units, the Plaintiffs argue that the transactions at issue were also a contractual *distribution* of ETE assets to some, but not all, partners, and were

---

[155] At oral argument, I expressed skepticism as to whether a contractually-sufficient Special Approval process could be found on the current record, as well as skepticism as to whether the record developed at trial would shed more light on the issue than the current record. I remain skeptical as to the former point, but on review, and in light of our summary judgment standard, I find further factual development desirable.

therefore in breach of the LPA. As described above, with respect to the issuance of units, the LPA provides broad discretion and authority regarding ETE's ability to issue securities (although a conflicted issuance must be "fair and reasonable" to ETE). A "distribution," by contrast, is subject to different strictures. I note that the term distribution is not defined in the LPA.

The LPA generally requires distributions made to partners *qua* partners to be pro rata.[156] Prior to Amendment 5, the LPA provided three provisions for distributions: pro rata cash distributions pursuant to Section 6.3, pro rata distributions of Partnership Securities pursuant to Section 5.10(a) titled "*Splits and Combinations*," and liquidation distributions pursuant to Section 12.4.[157] All distributions, prior to Amendment 5 to the LPA, were required to be pro-rata. It is the Plaintiffs contention that the Issuance is a distribution pursuant to Section 6.3, and is thus impermissible; they also argue that the Issuance violates new Section 6.3(g), added by Amendment 5 contemporaneously with the Issuance. The Plaintiffs seek a judgment confirming this assertion; Defendants seek a judgment to the contrary. The parties' arguments are set forth in more detail, below.

---

[156] *See* LPA §§ 5.10, 6.3.
[157] *See id.* §§ 5.10, 6.3, 12.4.

### a. The Parties' Contentions

The Plaintiffs seek a judgment that the Offering and the Issuance breached the LPA because they were non-pro-rata distributions, made to some, but not all, limited partners in their capacity as partners. Principally, the Plaintiffs point to Section 5.10(a) to buttress their argument that the present transactions were unauthorized distributions. Section 5.10(a) titled "*Splits and Combinations*"[158] provides the following:

> [s]ubject to Section 5.8(d), the Partnership may make a Pro Rata *distribution* of Partnership Securities to all Record Holders or may effect a subdivision or combination of Partnership Securities so long as, after any such event, each Partner *shall have the same Percentage Interest in the Partnership as before such event*, and any amounts calculated on a per Unit basis or stated as a number of Units are proportionately adjusted.[159]

Section 5.8(d), referenced above in Section 5.10(a), is under the portion of the LPA titled "*Issuances of Additional Partnership Securities*" and provides that:

> [n]o fractional Partnership Securities shall be issued by the Partnership. If a *distribution, subdivision or combination* of Units pursuant to Section 5.8 would result in the *issuance* of fractional Units, each fractional Unit shall be rounded to the nearest whole Unit (and a 0.5 Unit shall be rounded to the next higher Unit).[160]

Reading these two provisions together, the Plaintiffs make the unremarkable observation that they "demonstrate conclusively that an issuance of equity securities

---

[158] I note the LPA provides that headings are "for reference purposes only." *See* LPA § 1.2.
[159] *Id.* § 5.10(a) (emphasis added).
[160] *Id.* § 5.8(d) (emphasis added).

34

can be a distribution."[161] Further, they assert that this "issuance of Convertible Units was a distribution of Partnership Securities to select limited partners in their capacity as Partners" and thus did not comply with Section 5.10(a)'s pro rata requirement.[162] They note that the default under DRUPLA is that distributions are pro rata, unless the operative partnership agreement provides otherwise.[163]

Additionally, the Plaintiffs argue that Section 6.3(g), which was added by Amendment 5—the purpose of which, presumably, was to permit the Issuance—was breached.[164] Section 6.3 is titled "*Requirement and Characterization of Distributions; Distributions to Record Holders*."[165] Amendment 5 modified Section 6.3(a) by removing a prior provision there that required cash distributions to be pro rata; the Issuance creates two classes of units which receive cash distributions differently, and would run afoul of the original provision.[166] The amended Section 6 provides at 6.3(g) that "any distribution constituting an Extraordinary Distribution shall be distributed to the General Partner and the holders of the Common Units and Series A Convertible Units, *in accordance with their respective Percentage Interests* . . . ."[167] Extraordinary Distribution is a defined contractual term and includes "any

---

[161] Pls' Answering Br. 30.
[162] *Id.* at 26.
[163] *See* 6 *Del. C.* § 17–504.
[164] *See* Pls' Opening Br. 41.
[165] LPA § 6.3.
[166] *See* Juray Aff. Ex. 41§ 1(f).
[167] *Id.* (emphasis added).

non-cash distribution."[168]   The Plaintiffs' argue that the Convertible Units transaction was itself an extraordinary distribution not in accordance with a unitholder's percentage interest in violation of the LPA.[169]

The Defendants have moved on this issue as well, arguing for judgment in their favor on Count I of the Complaint, which asserts that the Issuance is an impermissible distribution. The Defendants ask that I find that the transactions regarding the Issuance were permitted issuances of equity securities governed by Section 5.8 of the LPA, and were not "distributions," as a matter of law.[170]

The Defendants rely principally on Section 5.8(a) of the LPA, set out in full above. That section gives the Director Defendants and the General Partner broad authority to issue securities. The Defendants also point to Section 7.6(f), which provides that in the context of conflicted transactions, when assets are contributed "in exchange for Partnership Securities, the Conflicts Committee, in determining whether the appropriate number of Partnership Securities are being *issued*, may take into account . . ." various factors.[171]   This specific provision, according to the Defendants, cannot be harmonized with the broad definition of "distribution" proposed by the Plaintiffs.

---

[168] Juray Aff. Ex. 41 § 1(a).
[169] *See* Pls' Opening Br. 57–58.
[170] *See* Defs' Opening Br. 27–28.
[171] LPA § 7.6(f) (emphasis added).

None of the provisions in the LPA defines issuance or distribution.

### b. Defaults

DRULPA supplies certain default rules for distributions. Section 17-504 titled "Allocation of distributions" provides the following:

> [d]istributions of cash or other assets of a limited partnership *shall be allocated among the partners*, and among classes or groups of partners, *in the manner provided in the partnership agreement*. If the partnership agreement does not so provide, distributions shall be made on the basis of the agreed value (as stated in the records of the limited partnership) of the contributions made by each partner to the extent they have been received by the limited partnership and have not been returned.[172]

This provision provides that the LPA governs how distributions are to be allocated, and provides for pro rata distributions where an LPA is silent. DRULPA, however, does not define the term "distribution."

### c. This LPA

The primary question here is what constitutes an "issuance" and what constitutes a "distribution" under the terms of the LPA. Granting the parties' cross-motions would require me to determine the meaning of these terms under this particular LPA to the extent necessary to characterize the actions of the Defendants as either a "distribution" or an "issuance," or, more precisely, to determine whether the transaction here was an "issuance" that was also a "distribution," as a matter of law.

---

[172] 6 *Del. C.* § 17–504 (emphasis added).

The Defendants put forward the following definition: "a 'distribution' is a disbursement of the partnership's assets to the partners by virtue of their status as equity holders."[173] The Defendants assert that a distribution is "akin to a corporate dividend" and "occurs when a partnership, *without receiving anything in return*, gives its assets or earnings to its partners by virtue of their status as equity holders."[174] Thus, Defendants argue Section 6.3 and the term distribution under the LPA are triggered only where a transfer is made to a partner, which transfer "also (a) lacks consideration, and (b) disburses the wealth of the partnership to its partners."[175] The Defendants point out that a 2015 "stock split" "was indisputably a 'distribution'" as it was given to all common unitholders for no consideration.[176] According to the Defendants, the issuance of securities to certain partners in return for surrender of other securities at issue here was a transfer for value, and thus not a distribution.

The Plaintiffs define distribution as any *transfer* "to <u>partners</u> in their <u>capacity as partners</u>," and assert there is no requirement that "the transfer must be for no

---

[173] Defs' Opening Br. 27. *See* Defs' Answering Br. 2 ("[A] distribution is the MLP equivalent of a dividend: it is the disbursement of wealth from ETE to its partners. Where, as here, ETE is offering securities to its partners in exchange for consideration, the transaction is an issuance subject to Section 5.8, not a distribution subject to Section 6.3.").

[174] Defs' Answering Br. 5 (emphasis added). *See id.* at 12 (arguing "a distribution occurs when a partnership 'gives' its wealth to its partners, not when it offers to exchange new partnership securities for consideration").

[175] Defs' Answering Br. 16.

[176] Defs' Answering Br. 17–18.

consideration."[177]  That is, a distribution "occurs when cash, Partnership Securities or other property of the Partnership is allocated among the Partners."[178]  Therefore, the Plaintiffs argue, the present transactions, which allocated valuable rights to some (but not all) partners, constitute an issuance that was also a distribution.[179]  Additionally, the Plaintiffs argue that to the extent there is any ambiguity in the LPA it should be construed against the Defendants.[180]

Because the LPA does not define "distribution," I must look to the use of the term in context in the LPA, and to everyday usage, to supply a meaning.[181]  Starting with usage, Black's Law Dictionary defines partnership distribution as "[a] partnership's payment of cash or property to a partner out of earnings or as an advance against future earnings, or a payment of the partners' capital in partial or complete liquidation of the partner's interest."[182]  The text of the LPA itself,

---

[177] Pls' Opening Br. 43 (emphasis in original).  The Plaintiffs state that, for example, the issuance of incentive rights to an employee who is also limited partner "would not be a distribution because the issuance was not in his capacity as a limited partner." *Id.* at n.144.

[178] Pls' Opening Br. 42.

[179] *See* Pls' Opening Br. 45 ("When securities are issued as a distribution, such an issuance is subject to the Partnership Agreement's terms limiting permissible distributions."); Pls' Answering Br. 29 ("The Convertible Units Distribution (and the Rights Distribution) involved a transfer of securities from the Partnership to Partners in their capacity as Partners.  That type of securities issuance is a distribution.").

[180] *See* Nov. 9, 2016 Oral Arg. Tr. 20:15–21:6.

[181] *See Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 738 (Del. 2006) ("Under well-settled case law, Delaware courts look to dictionaries for assistance in determining the plain meaning of terms which are not defined in a contract.").

[182] PARTNERSHIP DISTRIBUTION, Black's Law Dictionary (10th ed. 2014) (Westlaw); *See Interactive Corp. V. Vivendi Universal, S.A.*, 2004 WL 1572932, at *3 (Del. Ch. June 30, 2004) (using the same definition of "partnership distribution").

including specifically its usage of the terms "issuance" and "distribution," appears consistent with the Black's definition. The parties indulge in close textual analysis of the various provisions of the LPA to bolster their arguments that partial summary judgment is appropriate on the issue.

I decline, however, to find as a matter of law on the record now before me what "distribution" means in the context of the issuance of convertible units in return for common units. The record is incomplete, or in dispute, on issues helpful to my analysis, including whether the Issuance was a true exchange for value, or simply a way to provide favored unitholders a device to avoid the implication of a Merger which would make cash distributions in the intermediate future unlikely. I note that such issues overlap with consideration of the role of the Conflicts Committee, and whether the Issuance, seen through the lens of a conflicted transaction, was fair and reasonable to ETE. A trial to vindicate the protections extended unitholders under the LPA will provide a record on which to evaluate the process undertaken and decisions made by the Defendants in connection with these transactions. I find it appropriate to defer this necessarily context-driven analysis of the Issuance as a contractual "distribution" pending such record.

### 3. The Defendants' Motion Regarding Count III

Pursuant to Section 13.1(g) of the LPA, the General Partner is permitted to amend the LPA without the approval of other Partners where it is "an amendment

40

that the General Partner determines to be necessary or appropriate in connection with the authorization of issuance of any class or series of Partnership Securities pursuant to Section 5.8."[183] The Defendants seek a judgment that "Count III fails as a matter of law to the extent it relates to a breach by the General Partner for approving the Amendment because Section 13.1(g) forecloses any such claim."[184]

The Defendants conceded at oral argument that an amendment made under Section 13.1(g) is subject to review under Section 7.9(b) of the LPA.[185] That Section requires that subject actions be taken in "good faith," and requires that the person taking the action "must believe that the determination or other action is in the best interests of the Partnership."[186] I am unable to determine on this record that the General Partner's imposition of Amendment 5 meets this standard.[187] Therefore, I cannot find that Section 13.1(g) was satisfied as a matter of law, thus this portion of Defendants' motion is denied.

### 4. Other Issues

The parties briefed a number of other issues that may be mooted or informed by my analysis here, or may, alternatively, be ripe for partial summary judgment.

---

[183] LPA § 13.1(g).
[184] Defs' Opening Br. 32.
[185] Nov. 9, 2016 Oral Arg. Tr. 88:13–89:4.
[186] LPA § 7.9(b).
[187] I make no determination whether this amendment would also be subject to the conflicts provisions of Section 7.9(a) of the LPA.

The Parties should confer and inform me of any issues they believe remain to be determined before trial.

## IV. CONCLUSION

The Cross Motions for Summary Judgment are DENIED as provided in the discussion above. Counsel should confer about what issues remain outstanding, and provide a form of order consistent with this Memorandum Opinion.